## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Between in or around July 2017 and September 2017, in the District of Maryland and elsewhere, the Defendant, **MING ZHANG ("ZHANG")**, knowingly conspired, combined, confederated, and agreed with Co-Conspirator A and others, to commit an offense against the United States, that is, to transport in interstate commerce any money, of the value of $5,000 or more, knowing the same to have been stolen, converted, and taken by fraud, in violation of 18 U.S.C. § 2314.

The conspiracy centered around a scheme to defraud Maryland casinos by cheating at the game of baccarat. Baccarat is a card game in which players compare the value of two hands of cards—a "player" hand and a "dealer" hand. Each card has a point value, and before any cards are dealt, bettors place bets on which hand will be closest to nine. An employee of the casino, called a "dealer," then distributes the cards between the player and dealer hands according to fixed rules. Unlike in the casino game of blackjack, where a player can choose an action each turn that can affect the distribution of cards, in baccarat no bettor action can alter whether a given card is placed in the player hand or the dealer hand. As such, if a bettor knows the order in which cards appear in the deck, they can predict the outcome of any given baccarat hand with near-perfect accuracy and place their bets accordingly.

In order to prevent players from knowing the order in which cards will be dealt, casinos require dealers to shuffle the cards before placing them in play. Baccarat games are typically played with eight decks of 52 cards. At the start of the game, the dealer spreads all of the cards on the table and then shuffles them. Once shuffled, the decks are placed in a "shoe," which is a plastic box that keeps the cards in order until they are dealt.

During all relevant times, **ZHANG** worked as a dealer at Casino 1. **ZHANG**'s chief role in this conspiracy was to alert Co-Conspirator A as to when **ZHANG** was scheduled to deal baccarat at Casino 1. Once Co-Conspirator A arrived at the baccarat table at which **ZHANG** was dealing, **ZHANG** exposed a portion of the baccarat deck to Co-Conspirator A, allowed Co-Conspirator A to take a picture of the deck, and placed the portion unshuffled into the shoe. In furtherance of the conspiracy, on September 27, 2017, **ZHANG** followed these procedures (collectively, these procedures are hereinafter referred to as "the scheme"). **ZHANG** knew that Co-Conspirator A and others would transport any money that they successfully stole as part of this scheme across state lines.

In exchange for **ZHANG**'s participation in the conspiracy, a co-conspirator paid **ZHANG** money in or about August 2017 and promised **ZHANG** additional proceeds from the profits of the scheme.

In furtherance of the conspiracy, **ZHANG** committed the following acts, among others:

- In or about July, August, or September 2017, **ZHANG** observed Co-Conspirator A and other co-conspirators executing the scheme at Casino 2.

- Between approximately July 2017 and September 2017, **ZHANG** was present with Co-Conspirator A when Co-Conspirator A executed the scheme at Casino 2.

- In or about August 2017, at a hotel near Casino 2, **ZHANG** met with Co-Conspirator A to discuss the details of the scheme. Co-Conspirator A purchased two decks of cards and demonstrated to **ZHANG** that after **ZHANG** spread the cards face up, Co-Conspirator A would record the cards. Co-Conspirator A then explained that **ZHANG** should not shuffle that section of the cards and Co-Conspirator A would place bets accordingly. **ZHANG** and Co-Conspirator A agreed that **ZHANG** would receive a percentage of Co-Conspirator A's winnings from the scheme. **ZHANG** accepted a payment of $1,000 cash after being informed of the scheme.

- Following their meeting near Casino 2, **ZHANG** and Co-Conspirator A spoke on numerous occasions when Co-Conspirator A asked **ZHANG** to execute the scheme.

- On or about September 27, 2017, in Maryland, **ZHANG** called Co-Conspirator A to inform Co-Conspirator A that **ZHANG** would be dealing baccarat at Casino 1 that evening.

- On or about September 27, 2017, **ZHANG** dealt baccarat at Casino 1 while Co-Conspirator A sat at his table. **ZHANG** exposed the deck of cards. In furtherance of the conspiracy, **ZHANG** allowed Co-Conspirator A to record the exposed cards by photo or video. **ZHANG** then failed to shuffle a portion of the deck, placing the unshuffled cards into play in the same order as they were exposed to Co-Conspirator A. Co-Conspirator A and other players placed large bets when the unshuffled portion of the deck came into play.

- On or about September 27, 2017, after his co-conspirators successfully executed their scheme at Casino 1, **ZHANG** contacted Co-Conspirator A to arrange to receive a portion of the profits of the scheme. Co-Conspirator A told **ZHANG** that Co-Conspirator A was returning to New York and would contact **ZHANG** at a later date.

- On or about September 28, 2017, **ZHANG** lied to investigators at Casino 1 about **ZHANG's** knowledge of and participation in the scheme.

The funds that **ZHANG**, Co-Conspirator A, and others stole from Casino 1 in September 2017 were transported across state lines from Maryland to New York. The total loss caused by **ZHANG** and his coconspirators because of their involvement in this scheme was $1,046,560.

SO STIPULATED:

_____
Molissa H. Farber
Erin B. Pulice
Assistant United States Attorneys

_____
Ming Zhang
Defendant

_____
Marc G. Hall, Esq.
Counsel for Defendant